**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| GREG MUTTITT, |
| Plaintiff, |
| v. |
| DEPARTMENT OF STATE, *et al.*, |
| Defendants. |

Civil Action No. 10-202 (BAH)

Judge Beryl A. Howell

**<u>MEMORANDUM OPINION</u>**

The plaintiff, Greg Muttitt, brings this action against the U.S. Department of State (the "State Department") pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. The plaintiff is an author who sought records from the State Department regarding the development of Iraq's energy policy and national hydrocarbon law, for the purpose of writing a book on those subjects.[1] He now challenges several aspects of the State Department's response to his five FOIA requests, including the propriety of the State Department's denial of the plaintiff's requests for a fee waiver and expedited processing, the adequacy of the State Department's search efforts, and the validity of the State Department's determinations to withhold certain responsive records in whole or in part. The State Department has moved for summary judgment on all of the plaintiff's remaining claims.

---

[1] Apparently, this book was ultimately published in April 2011. *See* Mem. of P. & A. in Supp. of Def.'s Mot. for Partial Summ. J. ("Def.'s Mem.") at 2, ECF No. 34-1.

I.    **BACKGROUND**

A.    **The FOIA Requests at Issue**

This action arises out of five separate FOIA requests submitted by the plaintiff between April and November 2009 to the defendant, seeking various records from specific time periods between 2006 and 2009.  The Court will discuss each of these requests *seriatim*.

1.    *Request #1*

The first such request ("Request #1"), submitted by letter on April 13, 2009, sought "[d]ocuments relating to advice by U.S. officials to the Iraq Ministry of Oil, on the subject of contracts with international oil companies, between September 1, 2007, and December 31, 2008."  *See* Decl. of Margaret P. Grafeld ("Grafeld Decl.") Ex. 1, at 1, ECF No. 34-3.[2]  Request #1 also sought a fee waiver pursuant to 5 U.S.C. § 552(a)(4)(A)(iii).[3]  *See id.* at 2.  The plaintiff also requested, via a separate letter dated June 12, 2009, for Request #1 to be processed on an expedited basis because he "need[ed] the information urgently for disseminating information, in order to inform the public concerning Federal Government activity."  Grafeld Decl. Ex. 2, at 2.  The defendant wrote to the plaintiff on July 7, 2009, acknowledging Request #1 and notifying the plaintiff that his requests for a fee waiver and expedited processing were denied.  *See* Grafeld Decl. Ex. 3, at 1, 3–4.  On November 20, 2009, the plaintiff filed an administrative appeal of the State Department's "constructive denial of [his] FOIA request and its constructive denial of [his] request for expedited processing," Grafeld Decl. Ex. 5, at 2, though the State Department never responded to this appeal.  Between October 15, 2010, and February 22, 2011, the State

---

[2] The Grafeld Declaration and all exhibits attached thereto are located at ECF No. 34-3.

[3] 5 U.S.C. § 552(a)(4)(A)(iii) provides:

> Documents shall be furnished without any charge or at a charge reduced below the fees established under clause (ii) if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester.

Department sent the plaintiff four letters, each of which notified him when searches of various agency components had been completed, how many responsive records were located in the search of each component, and which responsive records were being disclosed, in whole or in part.  *See* Grafeld Decl. Exs. 8–11.  In sum, the State Department located forty-two records responsive to Request #1.  *See id.*; *see also* Grafeld Decl. ¶¶ 11–14.  Twelve of these responsive records were released in full, fifteen of them were released in part with certain portions redacted, and fifteen of them were withheld in full.  *See* Grafeld Decl. Exs. 8–11.

### 2.    *Request #2*

The plaintiff's second request ("Request #2") to the State Department, submitted by letter on June 19, 2009, sought the release of "[a]ll cable traffic to and from the US Embassy in Baghdad, dated between 20 May 2006 and 15 June 2006, on the subject of the Iraq oil law."[4] Grafeld Decl. Ex. 12, at 1.  Request #2 also sought a fee waiver pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) and expedited processing because the plaintiff "need[ed] the information urgently for dissemination, in order to inform the public concerning Federal Government activity."  *Id.* at 1–3.  On July 1, 2009, the State Department acknowledged the plaintiff's request via e-mail and sought further information about the nature of the book the plaintiff was planning to write with the information he obtained through his request.[5]  *See* Grafeld Decl. Ex. 13, at 1. After receiving more information from the plaintiff, *see* Grafeld Decl. Ex. 14, the State Department notified the plaintiff via letter on July 7, 2009 that it was denying his requests for a fee waiver and expedited processing.  *See* Grafeld Decl. Ex. 15, at 3–4.  On August 15, 2009, the plaintiff filed a lengthy administrative appeal of the State Department's denial of his requests for

---

[4] The plaintiff later agreed to narrow the scope of Request #2 to "cable traffic between Baghdad and Washington." *See* Grafeld Decl. Ex. 22, at 1.

[5] The plaintiff noted in Request #2 that "[w]herever possible, I would prefer that written communications in relation to this request are sent by email rather than posted letter."  Grafeld Decl. Ex. 12, at 3.

a fee waiver and expedited processing, *see* Grafeld Decl. Ex. 16, but on October 28, 2009 the State Department notified the plaintiff via letter that it was affirming the denial of both requests, *see* Grafeld Decl. Exs. 18–19.  On July 16, 2010, the State Department notified the plaintiff that it had located one document responsive to Request #2, which it released in part.  *See* Grafeld Decl. Ex. 23.

### 3.    *Request #3*

On July 23, 2009 the plaintiff submitted, via letter, his third FOIA request to the State Department ("Request #3"), which sought "[a]ll cable traffic to and from the U.S. Embassy in Baghdad, dated between February 6 and February 28, 2007, on the subject of the Iraq oil law." Grafeld Decl. Ex. 24, at 1.[6]  Request #3 likewise sought a fee waiver and expedited processing on the same grounds as those cited in Requests #1 and #2.  *See id.* at 1–4.  On October 28, 2009, the State Department acknowledged Request #3 and notified the plaintiff that his requests for a fee waiver and expedited processing were denied.  *See* Grafeld Decl. Ex. 25, at 1, 3–4.  On November 20, 2009, the plaintiff submitted via e-mail an administrative appeal of "the State Department's constructive denial of [his] FOIA request and its constructive denial of [his] request for expedited processing," *see* Grafeld Decl. Ex. 28, at 2, though the State Department never responded to this appeal.  By letter dated September 8, 2010, the State Department notified the plaintiff that it located nineteen records responsive to Request #3.  *See* Grafeld Decl. Ex. 30, at 1.  One of those records was released in full, six of the records were released in part with redactions, and twelve of the records were withheld in full.  *See id.*

---

[6] The plaintiff later clarified that, in relation to Request #3, he wanted the State Department "to search for any cables between Baghdad and regional offices in Irbil or Sulimaniya [sic] (both in Iraqi Kurdistan), as well between Baghdad and Washington."  *See* Grafeld Decl. Ex. 22, at 1.

### 4.    *Request #4*

On October 4, 2009, the plaintiff submitted his fourth request ("Request #4") to the State

Department, which sought "[a]ll releasable documents relating to the work of Meghan

O'Sullivan in Iraq, between June 1, 2007 and October 1,2007."  Grafeld Decl. Ex. 31, at 1.  As

the request explained, during this period of time Dr. O'Sullivan "was Presidential Envoy to Iraq"

and "the primary purpose of her work was to press Iraqi politicians to achieve a set of

'benchmarks,' which had been set out by the President and by Congress," including passage of

the Iraqi hydrocarbon law.  *See id.* at 1.  The request specified that it was seeking, *inter alia*,

"[e]mails to and from Dr. O'Sullivan."  *Id.* at 1.  Request #4, like its predecessors, also sought a

fee waiver and expedited processing.  *See id.* at 1–6.  On October 9, 2009, the State Department

sent a letter to the plaintiff acknowledging Request #4 and denying his requests for a fee waiver

and expedited processing.  *See* Grafeld Decl. Ex. 32, at 1, 3–4.  Much like the previous requests,

the plaintiff sent a letter to the State Department on November 20, 2009, appealing "the State

Department's constructive denial of [his] FOIA request and its constructive denial of [his]

request for expedited processing."  *See* Grafeld Decl. Ex. 35, at 2.  On December 2, 2009, the

State Department informed the plaintiff via letter that it was affirming its decision to deny his

request for expedited processing.  *See* Grafeld Decl. Ex. 37, at 1.  Between October 15, 2010 and

February 17, 2011, the State Department sent the plaintiff three letters notifying him when

searches of various agency components were completed and releasing any non-exempt,

responsive material.  *See* Grafeld Decl. Exs. 38–40.  In sum, the State Department located

twenty-eight records responsive to Request #4.  *See id.*  One of these records was released in full,

ten were released in part with redactions, and the remaining seventeen records were withheld in

full.  *See id.*; *see also* Def.'s Statement of Material Facts Not in Dispute ("Def.'s Facts") ¶ 38,
ECF No. 34-2.

### 5.    *Request #5*

On November 11, 2009, the plaintiff submitted his fifth and final FOIA request to the
State Department ("Request #5"), which sought "[d]ocuments on the subject of the Iraqi oil and
gas (hydrocarbon) sector, relating to Vice President Biden's visits to Iraq on July 2–4 and
September 15–16, 2009."  Grafeld Decl. Ex. 41, at 1.  This last request also sought a fee waiver
and expedited processing.  *See id.* at 1–5.  On November 17, 2009, the State Department sent the
plaintiff a letter acknowledging receipt of Request #5 and denying his requests for a fee waiver
and expedited processing.  *See* Grafeld Decl. Ex. 42, at 1, 3–4.  On December 21, 2009, the
plaintiff sent an e-mail to the State Department, appealing the "constructive denial of [his] FOIA
request" and the "constructive denial of [his] request for expedited processing."  Grafeld Decl.
Ex. 43, at 2.  In a letter dated December 23, 2009, the State Department notified the plaintiff that
it was affirming its decision to deny the plaintiff's request for expedited processing.  *See* Grafeld
Decl. Ex. 45.  Between December 14, 2010 and February 17, 2011, the State Department sent the
plaintiff three letters notifying him when the searches of various agency components had been
searched and releasing any non-exempt, responsive records.  *See* Grafeld Decl. Exs. 46–48.  In
sum, the State Department located four records responsive to Request #5.  *See id.*  One of the
documents was released in part with redactions and the other three were withheld in full.  *See id.*;
*see also* Def.'s Facts ¶ 40.

In total, the State Department located ninety-four unique documents responsive to the
plaintiff's five FOIA requests.  Fourteen of those documents were released to the plaintiff in full,

thirty-three were released in part with redactions, and forty-seven were withheld in full.  *See* Grafeld Decl. ¶ 206.[7]

### B.    District Court Proceedings

The plaintiff filed his Complaint in the instant action on February 5, 2010, while the State Department was still processing his five FOIA requests.  *See* Compl., ECF No. 1.  The plaintiff then filed an amended complaint on March 3, 2010.  *See* First Am. Compl. ("FAC"), ECF No. 10.  The First Amended Complaint originally stated twenty-six separate causes of action against four federal agencies, including the State Department, but the scope of this action has narrowed significantly since then.  On December 15, 2010 the plaintiff stipulated to the dismissal of all claims against the Department of Defense and the U.S. Central Command.  *See* Stipulation of Dismissal with Prejudice, ECF No. 29.  On January 24, 2011, the plaintiff likewise stipulated to the dismissal of all claims against the Department of the Treasury.  *See* Stipulation of Dismissal, ECF No. 30.[8]  On September 28, 2011, this Court dismissed Count 26 of the First Amended Complaint in response to a partial motion to dismiss filed by all four of the original defendants. *See Muttitt v. U.S. Cent. Command*, 813 F. Supp. 2d 221, 231 (D.D.C. 2011).  On December 1, 2011, the plaintiff voluntarily dismissed Count 25 of the First Amended Complaint, which was pleaded against the State Department.  *See* Stipulation of Dismissal with Prejudice, ECF No. 48. Finally, the plaintiff voluntarily agreed to dismiss Count 14 of the First Amended Complaint. *See* Def.'s Ex. 3, ECF No. 34-6.  After all of these dismissals, there are nine claims remaining against the defendant State Department, all of which relate to the five specific FOIA requests discussed above.  Currently pending before the Court is the State Department's motion for

---

[7] As the State Department indicates, six documents responsive to the plaintiffs' FOIA requests "were duplicates, accounted for in one of Plaintiff's prior FOIA requests."  Grafeld Decl. ¶ 206.

[8] The parties specified in the dismissal of the Treasury Department that "[t]he only issue remaining with respect to Counts 22, 23, and 24 is plaintiff's alleged entitlement to attorney's fees on the claims detailed therein."  Stipulation of Dismissal at 2, ECF No. 30.

summary judgment on these nine remaining claims and a motion by the plaintiff to file additional

evidence in opposition to the defendant's summary judgment motion.  For the reasons discussed

below, the Court grants in part and denies in part the defendant's motion for summary judgment

and denies the plaintiff's motion for leave to file additional evidence.

## II.    LEGAL STANDARD

Congress enacted the FOIA to promote transparency across the government.  *See* 5

U.S.C. § 552; *Quick v. U.S. Dep't of Commerce, Nat'l Inst. of Standards & Tech.*, 775 F. Supp.

2d 174, 179 (D.D.C. 2011).  The Supreme Court has explained that the FOIA is "a means for

citizens to know 'what their Government is up to.'  This phrase should not be dismissed as a

convenient formalism.  It defines a structural necessity in a real democracy." *Nat'l Archives &

Records Admin. v. Favish*, 541 U.S. 157, 171–72 (2004) (citation and internal quotation marks

omitted).  "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning

of a democratic society, needed to check against corruption and to hold the governors

accountable to the governed."  *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).

As a result, the FOIA requires federal agencies to release all records responsive to a request for

production.  *See* 5 U.S.C. § 552(a)(3)(A).  Federal courts are authorized under the FOIA "to

enjoin the agency from withholding agency records and to order the production of any agency

records improperly withheld from the complainant."  *Id.* § 552(a)(4)(B).

This strong interest in transparency must be tempered, however, by the "legitimate

governmental and private interests [that] could be harmed by release of certain types of

information."  *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 559 (D.C. Cir. 2010)

(internal quotation marks omitted); *see also Critical Mass Energy Project v. Nuclear Regulatory

Comm'n*, 975 F.2d 871, 872 (D.C. Cir. 1992) (en banc).  Accordingly, Congress included nine

exemptions permitting agencies to withhold information from FOIA disclosure.  *See* 5 U.S.C. § 552(b).  "These exemptions are explicitly made exclusive, and must be narrowly construed." *Milner v. Dep't of the Navy*, 131 S. Ct. 1259, 1262 (2011) (citations and internal quotation marks omitted); *see also Pub. Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d 865, 869 (D.C. Cir. 2010) ("FOIA allows agencies to withhold only those documents that fall under one of nine specific exemptions, which are construed narrowly in keeping with FOIA's presumption in favor of disclosure." (citations omitted)).  When a FOIA requester properly exhausts its administrative remedies, it may file a civil action challenging an agency's response to its request.  *See* 5 U.S.C. § 552(a)(4)(B); *Wilbur v. CIA*, 355 F.3d 675, 677 (D.C. Cir. 2004).  Once such an action is filed, the agency generally has the burden of demonstrating that its response to the plaintiff's FOIA request was appropriate.

When an agency's response to a FOIA request is to withhold responsive records, either in whole or in part, the agency "bears the burden of proving the applicability of claimed exemptions." *Am. Civil Liberties Union v. U.S. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011).  "The government may satisfy its burden of establishing its right to withhold information from the public by submitting appropriate declarations and, where necessary, an index of the information withheld." *Am. Immigration Lawyers Ass'n v. U.S. Dep't of Homeland Sec.*, 852 F. Supp. 2d 66, 72 (D.D.C. 2012) (citing *Vaughn v. Rosen*, 484 F.2d 820, 827–28 (D.C. Cir. 1973)). "If an agency's affidavit describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption," and "is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith, then summary judgment is warranted on the basis of the affidavit alone." *ACLU*, 628 F.3d at 619.  "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it

appears 'logical or 'plausible.'" *Id.* (internal quotation marks omitted) (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)).

When a requester challenges an agency's response based on the adequacy of the search performed, "[t]o prevail on summary judgment . . . the defending 'agency must show beyond material doubt . . . that it has conducted a search reasonably calculated to uncover all relevant documents.'" *Morley v. CIA*, 508 F.3d 1108, 1114 (D.C. Cir. 2007) (quoting *Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983)). "In order to obtain summary judgment the agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). "Summary judgment may be based on affidavit, if the declaration sets forth sufficiently detailed information 'for a court to determine if the search was adequate.'" *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 838 (D.C. Cir. 2001) (quoting *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995)).

## III.   DISCUSSION

The plaintiff challenges three aspects of the State Department's handling of his FOIA requests:  (1) the denial of his requests for fee waivers and expedited processing, (2) the agency's search efforts, and (3) the agency's withholding determinations.[9]  The Court will begin by discussing the denial of the plaintiff's requests for fee waivers and expedited processing before discussing the adequacy of the State Department's search efforts and the validity of the agency's withholding determinations.

---

[9] With reference to the First Amended Complaint, the plaintiff challenges the "constructive denial" of his five specific FOIA requests in Counts Thirteen, Fifteen, Seventeen, Twenty, and Twenty-One. *See* FAC ¶¶ 52–55, 61–64, 69–72, 80–88.  The plaintiff challenges the denials of his requests for expedited processing of Requests #5, #4, and #2 in Counts Twelve, Sixteen, and Nineteen, respectively.  *See id.* ¶¶ 48–51, 65–68, 77–79.  Finally, the plaintiff challenges the denial of his request for a fee waiver regarding Request #2 in Count Eighteen.  *See id.* ¶¶ 73–76.

A.      **Fee Waiver and Expedited Processing Determinations**

Four of the plaintiff's remaining causes of action in his First Amended Complaint

challenge the State Department's refusal to process Requests #2, #4, and #5 on an expedited

basis and its refusal to grant a fee waiver for Request #2.  *See* FAC ¶¶ 48–51, 65–68, 73–76, 77–

79.  The defendant contends that these claims are now moot because (1) the plaintiff was never

charged fees for any of his FOIA requests; and (2) "State has completed processing and releasing

non-exempt documents responsive to" Request #2, Request #4, and Request #5.  Mem. of P. &

A. in Supp. of Def.'s Mot. for Partial Summ. J. ("Def.'s Mem.") at 12–13, ECF No. 34-1.  For

these reasons, the defendant argues that "there is no further relief for the Court to provide with

respect to [the plaintiff's] expedited processing claims" and "[a] declaration by this Court as to

the propriety of State's [fee waiver] denial would constitute an advisory opinion."  *Id.*

At the outset, the plaintiff "concedes that his challenge to the actual denial of his request

for a public interest fee waiver for [Request #2] has been rendered moot."  Pl.'s Opp'n to Def.'s

Mot. for Summ. J. ("Pl.'s Opp'n") at 7, ECF No. 39.  Aside from this concession, the plaintiff's

opposition to the defendant's mootness arguments is two-fold.  First, the plaintiff argues that he

has impliedly pleaded that the State Department has a policy or practice of improperly denying

requests for expedited processing and fee waivers.  *See id.* at 7–13.  Despite conceding that he

"did not [plead] a specific count challenging the propriety of State's pattern[s] or practice[s],"

the plaintiff argues that his "Prayer for Relief clearly envisioned relief that would extend beyond

the three requests at issue and require review of the underlying pattern[s] or practice[s] that led to

the determinations."  *See id.* at 7, 10.  Second, the plaintiff argues that his claims related to the

specific denials of expedited processing are not moot because the State Department has not

provided a "complete response" to the plaintiff's FOIA requests.  *See id.* at 13–15.  This

argument stems from a provision of the FOIA, which states that "[a] district court of the United States shall not have jurisdiction to review an agency denial of expedited processing of a request for records after the agency has provided a complete response to the request."  5 U.S.C. § 552(a)(6)(E)(iv).  The plaintiff contends that, because the adequacy of the defendant's search efforts and the propriety of its withholding determinations remain contested, the State Department's response is not yet "complete" within the meaning of the FOIA.  *See* Pl.'s Opp'n at 14–15.

The Court will address the plaintiff's "policy or practice" argument first.  There is no question that the D.C. Circuit has recognized that, separate from claims seeking relief for specific FOIA requests, requesting parties may also assert a "claim that an agency policy or practice will impair the party's lawful access to information in the future."  *Payne Enters., Inc. v. United States*, 837 F.2d 486, 491 (D.C. Cir. 1988) (emphasis omitted); *accord Newport Aeronautical Sales v. Dep't of Air Force*, 684 F.3d 160, 164 (D.C. Cir. 2012).  To state a claim for relief under the "policy or practice" doctrine articulated in *Payne*, however, a plaintiff must allege, *inter alia*, facts establishing that the agency has adopted, endorsed, or implemented some policy or practice that constitutes an ongoing "failure to abide by the terms of the FOIA."  *Payne*, 837 F.2d at 491.

In the instant action, the plaintiff concedes that he did not state a separate cause of action for any policy or practice related to the denial of requests for expedited processing or fee waivers.  *See* Pl.'s Opp'n at 7, 10.  To cure this admitted deficiency in his pleading, the plaintiff attempts to rely on the language of his Prayer for Relief, which asked the Court to, *inter alia*, (1) "Declare and find that [the defendants] improperly denied [the plaintiff] expedited processing of his requests," (2) "Order [the defendants] to process [the plaintiff's] requests in an expedited

fashion," (3) "Declare and find that [the defendants] improperly denied [the plaintiff] public interest fee waivers," (4) "Order [the defendants] to grant [the plaintiff] public interest fee waivers where appropriate," and (5) "Grant such other relief as the Court may deem just and proper."  *See* FAC at 15–16; Pl.'s Opp'n at 7, 10–11.  As to the language in the Prayer for Relief, the plaintiff contends that "the 'where appropriate' language . . . was clearly intended to provoke an order that would be applicable to more than just the specific requests in the case, which would necessarily entail opining on the validity of State's pattern or practice."  Pl.'s Opp'n at 7.  The plaintiff also argues that "the request that the Court '[g]rant such other relief as the Court may deem just and proper' leaves the door open for just the type of declaratory and injunctive relief established by *Payne*."  *Id.*

Although creatively styled, the plaintiff's reliance on his Prayer for Relief in this regard is wholly unavailing.  To demonstrate why, the Court begins with reference to the fundamental purpose of the pleading standard set forth in Federal Rule of Civil Procedure 8.  That Rule "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Permitting the plaintiff to raise a policy-or-practice claim for the first time at summary judgment based solely on vague language in his Prayer for Relief would run contrary to Rule 8's purpose because the language cited by the plaintiff in his First Amended Complaint, by itself, does not put the defendant on notice of policy-or-practice claims related to the denial of requests for expedited processing or public-interest fee waivers.  Even assuming that a prayer for relief could sufficiently raise otherwise unpleaded claims, the plaintiff's exegesis of his Prayer for Relief in the instant action is unpersuasive.  Nothing in the language of the plaintiff's Prayer for Relief conveys the slightest

desire, let alone a "clear[] inten[t]," *see* Pl.'s Opp'n at 7, to raise a policy-or-practice claim related to expedited processing or fee waivers.  On the contrary, the language of the plaintiff's Prayer for Relief focuses on *specific* denials of requests for expedited processing and fee waivers.  *See* FAC at 15 (seeking declaration regarding improper denial of "expedited processing *of his requests*" (emphasis added)); *id.* at 16 (asking the Court to order the defendants "to process *Muttitt's requests* in an expedited fashion" (emphasis added)); *id.* (seeking declaration that defendants "improperly denied *Muttitt's public interest fee waivers*" (emphasis added)).  Although the plaintiff contends otherwise, his Prayer's reference to granting relief "where appropriate" and "[g]rant[ing] such other relief as the Court may deem just and proper," *id.* at 16—boilerplate language commonly invoked in prayers for relief—does not magically enlarge the plaintiff's otherwise specific FOIA claims into broad, policy-or-practice claims.

In fact, the language cited by the plaintiff stands in stark contrast to the other portions of his Prayer for Relief associated with the policy-or-practice claims that the plaintiff *did* plead in separate causes of action.  *See id.* (asking the Court to "[d]eclare and find that any [agency] regulations, guidelines, or policy statements that authorize the refusal to provide *a requester* with an estimated date of completion of a FOIA request constitutes an unreasonable interpretation of the statutory obligations imposed by the FOIA" (emphasis added)).[10]  Indeed, the simple fact that the plaintiff pleaded separate causes of action for policy-or-practice claims regarding *other* matters confirms that the plaintiff's failure to include a policy-or-practice cause of action about *these* matters (*i.e.*, expedited processing and fee waivers) was a conscious choice that the plaintiff simply now regrets.  Yet, the plaintiff cannot cure the problem by attempting, at the

---

[10] As discussed above, both of the policy-or-practice claims specifically pleaded by the plaintiff (Counts Twenty-Five and Twenty-Six of the First Amended Complaint, *see* FAC ¶¶ 100–111) were dismissed, either on motion, *see Muttitt*, 813 F. Supp. 2d at 231, or voluntarily by the plaintiff, *see* Stipulation of Dismissal with Prejudice, ECF No. 48.  *See supra* Part I.B.

summary judgment stage, to reverse-engineer causes of action that were never pled.[11]  A plaintiff

cannot ensconce claims between the lines of an otherwise garden-variety Prayer for Relief, only

to embellish those obscurities into new causes of action for the first time at summary judgment.

Therefore, the plaintiff may not now raise claims regarding the State Department's supposed

agency-wide policies or practices regarding the denial of requests for public-interest fee waivers

or expedited processing.[12]

As to the denial of specific requests for expedited processing, there is no clear authority

in this Circuit as to when challenges to such denials become moot.  Some cases have suggested

in dicta that once an agency has fully processed a FOIA request or moved a FOIA request to the

front of the line, the agency's prior refusal to process that request expeditiously is moot.  *See,*

*e.g.*, *Landmark Legal Found. v. EPA*, No. 12-1726, 2012 WL 6644362, at *2 (D.D.C. Dec. 21,

2012) (stating that "the Court believes that [plaintiff's] request for expedited processing may be

moot" because "EPA has already stated that [plaintiff's] request is 'at the top of the FOIA

processing queue'" and therefore "the Court questions whether an order compelling expedited

processing would afford any additional relief to [plaintiff]"); *Citizens for Responsibility & Ethics*

*in Wash. v. Dep't of Justice*, 535 F. Supp. 2d 157, 160 n.1 (D.D.C. 2008) ("Because DOJ has

---

[11] To the extent that the plaintiff is seeking to amend his complaint constructively through his summary judgment briefing, such constructive amendments are not generally permitted.  *See, e.g.*, *Citizens for Responsibility & Ethics in Wash. v. Cheney*, 593 F. Supp. 2d 194, 217 (D.D.C. 2009) ("It is well-established that a plaintiff cannot add or amend claims through an opposition to a motion for summary judgment.").  The only possible exception to this rule is when "the parties ha[ve] fully briefed an issue that was not necessarily raised in the complaint," because in such instances the issue has been "tried by the express or implied consent of the parties."  *See Turner v. Shinseki*, 824 F. Supp. 2d 99, 122 n.23 (D.D.C. 2011) (quoting FED. R. CIV. P. 15(b)(2)).  The exception articulated in *Turner*, however, does not apply in the instant action because the defendant has consistently maintained throughout its summary judgment briefing that the plaintiff "should not be permitted to amend his Complaint nearly 14 months later through opposition to Defendant's motion for summary judgment."  *See* Reply in Supp. of Def.'s Partial Mot. for Summ. J. ("Def.'s Reply") at 5, ECF No. 40.

[12] For these same reasons, the Court denies the plaintiff's motion for leave to file additional exhibits because the proffered additional exhibits are solely intended to support the plaintiff's purported policy-or-practice claims regarding fee waiver and expedited processing.  *See* Pl.'s Mot. for Leave to File Additional Exhibits at 2, ECF No. 50 (stating that additional exhibits "constitute material evidence of a pervasive misinterpretation of FOIA's provisions for public interest fee waivers and expedited processing").

now completed processing CREW's request, CREW recognizes that this [expedited processing] claim is moot."). In *Edmonds v. FBI*, 417 F.3d 1319 (D.C. Cir. 2005), the D.C. Circuit could be read to have suggested otherwise, but upon closer examination *Edmonds* does not preclude a finding of mootness in the instant case. In *Edmonds*, the Circuit held that a FOIA plaintiff was a "prevailing party" where the district court granted her "partial summary judgment on the question of expedited review" and ordered the agency to produce all nonexempt documents by a date certain. 417 F.3d at 1322–24. The Circuit observed that "expedited processing of a FOIA request is a statutory right, not just a matter of court procedure," and thus when the district court ordered production of non-exempt documents by a date certain, "it provided the plaintiff with full relief 'on the merits' of her claim to expedited treatment." *Id.* at 1323–24. In this regard, *Edmonds* distinguished the district court's order with the order entered by the district court in *Oil, Chemical & Atomic Workers International Union, AFL-CIO v. Department of Energy* ("*OCAW*"), 288 F.3d 452, 458 (D.C. Cir. 2002), which "require[d] that the Energy Department complete its record review in 60 days." The *Edmonds* Court held that this "'scheduling order[]'" in *OCAW* was "quite different from the one issued by the district court in this case," since the latter obligated the agency to produce documents by a date certain and thus "vindicated a statutory right that [the plaintiff's] complaint expressly claimed, and granted her relief that she specifically sought." *Edmonds*, 417 F.3d at 1323–24 (citations omitted).

Based on *Edmonds*, it appears that an important question to ask in determining whether a requester's claim regarding the denial of a request for expedited processing is moot is what relief the requester still has available if the denial is deemed incorrect. The text of the FOIA only requires that an agency "process as soon as practicable any request for records to which the agency has granted expedited processing." 5 U.S.C. § 552(a)(6)(E)(iii). Thus, the only relief

required by the FOIA with regard to expedited processing is moving an individual's request "to the front of the agency's processing queue." *See Leadership Conference on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246, 259 (D.D.C. 2005); *see also Long v. Dep't of Homeland Sec.*, 436 F. Supp. 2d 38, 44 (D.D.C. 2006) ("To compel the agency to provide expedited processing would merely place plaintiffs' request ahead of others that are awaiting responses to their requests."). In this sense, the district court in *Edmonds* went above and beyond the relief required by the FOIA when it ordered the responding to agency to "provide plaintiff with all documents as to which no exemption is being claimed' by [a date certain]." *Edmonds*, 417 F.3d at 1321. This appears to be largely because, at the time the plaintiff was seeking summary judgment on the expedited processing issue, the agency still had not yet provided any substantive response to the plaintiff's FOIA request and had instead moved for a stay of proceedings under *Open America v. Watergate Special Prosecution Force*, 547 F.2d 605 (D.C. Cir. 1976). *See Edmonds v. FBI*, No. 02-1294, 2002 WL 32539613, at *1–4 (D.D.C. Dec. 3, 2002). In the instant action, by contrast, the State Department has already fully processed the plaintiff's request at the administrative level and has already "provide[d] plaintiff with all documents as to which no exemption is being claimed.'" *Edmonds*, 417 F.3d at 1321.

Based on the text of the FOIA, prior precedent, and the procedural posture of the instant action, the Court concludes that the plaintiff's causes of action regarding the denial of his specific requests for expedited processing are now moot. The Court reads the Circuit's opinion in *Edmonds* to mean that the only scenario in which a court can properly grant relief to a FOIA requester "on the merits" of an expedited processing claim is when an agency has not yet provided a final substantive response to the individual's request for records. After that point, the timing of any further processing of an individual's request (either expeditiously or otherwise)

necessarily occurs at the direction of the court—pursuant to a scheduling order, not the expedited

processing provision of the FOIA.  For this reason, the Court construes the phrase "complete

response" in 5 U.S.C. § 552(a)(6)(E)(iv) to mean a final determination under § 552(a)(6)(A), *i.e.*,

a final administrative determination whether to release any records that are responsive to the

individual's request.  In order for its response to be "complete," an agency need not, as the

plaintiff argues, obtain a judicial declaration that its search efforts were adequate or that its

withholding determinations were warranted.  *See* Pl.'s Opp'n at 14–15.  Once an agency has

made its final determination under § 552(a)(6)(A), the *timeliness* of that determination is no

longer a live controversy fit for judicial review.  *See Atkins v. Dep't of Justice*, No. 90-5095,

1991 WL 185084, at *1 (D.C. Cir. Sept. 18, 1991) ("The question whether [the agency]

complied with the [FOIA's] time limitations in responding to [the plaintiff's] request is moot

because [the agency] has now responded to this request."); *Citizens for Responsibility & Ethics

in Wash. v. FEC*, 839 F. Supp. 2d 17, 24 (D.D.C. 2011) ("[T]o the extent that Plaintiff's

Complaint challenged the timeliness of [the agency's] production, it is now moot."); *Landmark

Legal Found. v. EPA*, 272 F. Supp. 2d 59, 68 (D.D.C. 2003) ("[A] lack of timeliness or

compliance with FOIA deadlines does not preclude summary judgment for an agency, nor

mandate summary judgment for the requester.").

> ### B. <u>Adequacy of the State Department's Search Efforts</u>

Next, the plaintiff mounts a narrow challenge to the adequacy of the State Department's

search efforts.  In particular, the plaintiff contends that the State Department's search efforts

were inadequate because, in response to Request #4, the agency failed to search a "recordkeeping

system," which the plaintiff believes is reasonably likely to contain e-mails authored by Dr.

O'Sullivan that are responsive to the plaintiff's request.  *See* Pl.'s Opp'n at 15–20.  As discussed

above, Request #4 sought "[a]ll releasable documents relating to the work of Meghan O'Sullivan in Iraq, between June 1, 2007 and October 1, 2007," including "[e]mails to and from Dr. O'Sullivan."  Grafeld Decl. Ex. 31, at 1.  In response to this request, the State Department first "scoured the Embassy's servers for any current or former email account assigned to the last name 'O'Sullivan' or 'OSullivan,'" but came up empty.  *See* Grafeld Decl. ¶ 59.  Next, the defendant "took additional steps to search for any paper copies of e-mails authored by O'Sullivan that might have been printed and filed," and determined that "any paper copies of e-mails that originated at Embassy Baghdad during the time period of Plaintiff's FOIA request would most likely have been retired."  *Id.* ¶ 60.  Knowing this, the defendant then searched all relevant retired files, starting with the retired file manifests, and then proceeding to a document-by-document review of *all* of the retired paper records.  *See id.* ¶ 61.  After all of this searching, "[n]o e-mails authored by O'Sullivan were located."  *Id.*

The plaintiff contends that these search efforts were insufficient by pointing to the State Department's "Records Schedule," which describes "Electronic Mail Records" as "[s]enders' and recipients' versions of electronic mail messages that meet the definition of Federal records, and any attachments to the record messages after they have been copied to an electronic recordkeeping system, paper, or microform for recordkeeping purposes."  *See* Pl.'s Ex. D at 1, ECF No. 39-5.  From this document, the plaintiff argues that any e-mails received or authored by Dr. O'Sullivan "of substantive importance" were required to be copied "to another recordkeeping system before deleting them."  Pl.'s Opp'n at 17.  Thus, the plaintiff's specific objection is that "State did not search the backup system to which such emails are required to be copied."  *Id.* at 18.

The problem with the plaintiff's argument, however, is that it presumes the existence of an *electronic*, as opposed to a paper, recordkeeping system where important e-mails are transferred once an individual's e-mail account is deactivated.  The document cited by the plaintiff clearly does not require that e-mail records be kept in an electronic recordkeeping system.  It merely requires that such e-mail records be "copied to an electronic recordkeeping system, paper, *or* microform."  Pl.'s Ex. D at 1 (emphasis added).  More importantly, the State Department maintains that "Plaintiff's assumption that Dr. O'Sullivan's e-mails must have been copied to an electronic recordkeeping system is incorrect."  Def.'s Reply at 10.  In fact, the agency's sworn declaration states clearly that "[t]here are no other [State] Department components or active or retired records systems that are reasonably likely to contain electronic or paper versions of e-mails authored by Meghan O'Sullivan between June 1, 2007 and October 1, 2007."  Grafeld Decl. ¶ 62.  From the agency's sworn statements, there is no reason to believe that an electronic backup recordkeeping system of the kind described by the plaintiff actually exists.  The agency's own regulations give it the option of keeping such records in electronic, paper, or microform format, *see* Pl.'s Ex. D, and the defendant's declaration establishes that the State Department has thus far elected to archive any retained e-mail records in paper format.  The agency's sworn statements "are accorded a presumption of good faith," which cannot be rebutted by the plaintiff's speculative claim that an electronic recordkeeping system exists.  *See SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991).  Therefore, the plaintiff's request for the State Department to conduct further searching of the purported electronic recordkeeping system is unwarranted.

The D.C. Circuit's decision in *Ancient Coin Collectors Guild v. U.S. Department of State*, 641 F.3d 504 (D.C. Cir. 2011), relied upon by the plaintiff, is not to the contrary.  In that case,

the D.C. Circuit dealt with a challenge to the adequacy of the State Department's search in response to a FOIA request in which the plaintiff contended that "State failed to show the adequacy of its search, because it didn't address its employees' archived emails and backup tapes." *See Ancient Coin Collectors*, 641 F.3d at 514.  The State Department had submitted a sworn declaration, which stated that staff members had "'searched their emails *as well as the archived emails of a former staff member*." *Id.* (emphasis added).  Picking up on this unexplained reference to "archived emails," the D.C. Circuit stated that "[n]owhere does State explain whether it possesses email archives for Bureau [of Educational and Cultural Affairs] employees other than the former staff member, whether there are backup tapes containing staff member emails and, if so, whether such backup tapes might contain emails no longer preserved on staff members' computers." *Id.  Ancient Coin Collectors* is distinguishable from the instant case, however, because in this case the State Department's declaration explains how the e-mails of former employees are archived and stored, and most importantly the State Department's declaration in the instant action also explains how the agency went about searching any e-mail archives reasonably likely to contain records responsive to the plaintiff's request.

The plaintiff also raises a second challenge to the defendant's search efforts for the first time in his sur-reply brief.  This argument is premised on another portion of the State Department "Records Schedule," which, according to the defendant's brief "directs Department personnel to retire records to the Records Services Center ('RSC') at the end of the calendar year during which the employee leaves the agency," and "[t]he records are subsequently transferred to the Washington National Records Center ('WNRC')."  *See* Def.'s Reply at 10 n.5 (citing Def.'s Reply Ex. 1, ECF No. 40-1).  From this statement, the plaintiff contends that the State Department must specify whether it searched "at the Embassy, at the RSC, or at the WNRC,"

since "without some indication of *what* retired paper records were searched, the Grafeld

Declaration is insufficient to support a finding for State on the adequacy of its search."  Pl.'s Sur-

Reply to Def.'s Mot. for Summ. J. ("Pl.'s Surreply") at 3, ECF No. 45.  Ultimately, the plaintiff

argues that "[o]nly by searching the retired paper records at all three locations would the

researcher be certain of locating any responsive emails."  *Id.* at 4.

Since this argument was raised for the first time in the plaintiff's sur-reply brief, the

defendant has not had an opportunity to respond to it.  No response from the State Department is

necessary, however, because the plaintiff's argument is insufficient to defeat summary judgment

for the defendant agency.  The plaintiff's argument once again assumes certain facts without a

sufficient basis for doing so.  Specifically, the plaintiff finely parses the phrase "reviewing the

retired file manifests from Embassy Baghdad," *see* Grafeld Decl. ¶ 61, and argues that this

phrase necessarily means that the State Department did not search retired records that might have

been physically located in the RSC or the WNRC.  *See* Pl.'s Surreply at 3.  Such an assumption

is unwarranted, however, particularly in light of the agency's statement that "[t]here are no other

Department components or active *or retired* records systems that are reasonably likely to

contain" responsive records.  Grafeld Decl. ¶ 62 (emphasis added).  The phrase "retired

manifests *from* Embassy Baghdad" in the defendant's declaration, *see id.* ¶ 61 (emphasis added),

is arguably ambiguous regarding whether the searched manifests were merely physically located

in the Embassy or whether they encompassed all manifests that originated from the Embassy

during the relevant time period.  The clear context of the agency's declaration, however,

confirms that the agency's search encompassed all retired files likely to contain responsive

records.  First, the agency declarant discusses how the researcher assigned to the plaintiff's case

searched for "any paper copies of e-mails that originated at Embassy Baghdad during the time

period of Plaintiff's FOIA request." *Id.* ¶ 60.  Additionally, by the time the plaintiff had

submitted his FOIA request (2009), any retired files from 2007 would have already been

transferred to the RSC anyway, according to the very Records Schedule cited by the plaintiff.

*See* Def.'s Reply at 10 n.5 (noting that retired records are sent to the RSC "at the end of the

calendar year during which the employee leaves the agency").  Finally, the agency's declaration

clearly states that the researcher "reviewed *all of the retired paper records . . .* by hand" before

concluding that no responsive records could be located.  *See* Grafeld Decl. ¶ 61 (emphasis

added).  These facts and sworn statements are sufficient to conclude that the State Department's

search efforts were not only reasonable but thorough.  As a result, the plaintiff's argument on this

point—based entirely on a semantic ambiguity in the agency's declaration—is unavailing, and

the defendant is entitled to summary judgment on the adequacy of its search efforts.

### C.   <u>Withholding Determinations</u>

The final category of issues raised by the plaintiff in opposition to the defendant's motion

for summary judgment have to do with the propriety of certain withholding determinations made

by the agency.  The State Department withheld certain documents, in whole or in part, under

FOIA Exemptions 1 and 5, and so the Court will address the plaintiff's arguments with respect to

each exemption in turn.

### 1.   *Material Withheld Under FOIA Exemption 1*

First, the plaintiff challenges a number of withholding determinations made pursuant to

FOIA Exemption 1.  That exemption provides that material is exempt from the FOIA if it is

"specifically authorized under criteria established by an Executive order to be kept secret in the

interest of national defense or foreign policy," and "[is] in fact properly classified pursuant to an

Executive order."  5 U.S.C. § 552(b)(1).  The plaintiff challenges the defendant's Exemption 1

withholding determinations as to thirty-seven total documents.  *See* Pl.'s Opp'n at 31–35.

Thirty-six of those thirty-seven documents were withheld under two independent provisions of

Executive Order 13,526.[13]   The first provision, § 1.4(d), permits the classification of information

pertaining to "foreign relations or foreign activities of the United States, including confidential

sources."  *See* Exec. Order 13,526 § 1.4(d).  The second provision, § 1.4(b), permits the

classification of "foreign government information," which is defined as, *inter alia*, "information

provided to the United States Government by a foreign government or governments . . . with the

expectation that the information, the source of the information, or both, are to be held in

confidence."  *See id.* §§ 1.4(b), 6.1(s).  Both of these provisions also require that the disclosure

of the information "could reasonably be expected to cause identifiable or describable damage to

the national security."  *Id.* § 1.4.

a)       *Withholdings Pursuant to § 1.4(d) of E.O. 13,526*

The Court will begin by discussing the plaintiff's objections to the material withheld as

classified pursuant to § 1.4(d) of the Executive Order.  As to this material, the plaintiff states on

the one hand that "[b]ecause of the vague and sweeping statements that purport to justify the

invocation of § 1.4(d) . . . Plaintiff cannot effectively contest the vast majority of these

withholdings."  Pl.'s Opp'n at 35.  Yet, on the other hand, the plaintiff states that he "is *fully

challenging* State's withholdings under § 1.4(d)" in thirty-four documents, thirty-three of which

were also withheld under § 1.4(b).  *See id.* (emphasis added).  The Court concludes that the

plaintiff has failed to articulate a cognizable challenge to the defendant's determination to

withhold from these thirty-four documents information which was classified pursuant to § 1.4(d).

At summary judgment, although the moving agency retains the "burden of proving the

---

[13] One of the thirty-seven documents (N1) contains information classified only pursuant to § 1.4(d).  *See* Grafeld
Decl. ¶ 172.

24

applicability of claimed exemptions," *ACLU*, 628 F.3d at 619, it is insufficient for the non-

moving party to state in conclusory fashion, as the plaintiff does here, that "State has not met

[its] burden, and summary judgment should not be awarded until it does." Pl.'s Opp'n at 35.

Rather, it is well established that "[t]o defeat summary judgment, the non-moving party must

'designate specific facts showing there is a genuine issue for trial.'" *Mingo Logan Coal Co. v.*

*EPA*, 850 F. Supp. 2d 133, 138 (D.D.C. 2012) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317,

324 (1986)).  Although the plaintiff nebulously accuses the State Department of submitting

"vague and sweeping statements that purport to justify the invocation of § 1.4(d)," Pl.'s Opp'n at

35, the plaintiff does not contest the State Department's statement that the information withheld

pursuant to § 1.4(d) "concerns the United States' role in formulating Iraq's proposed

hydrocarbons law and developing Iraq's oil and gas sector, as well as the political and economic

state of Iraq during a time of relative instability," Def.'s Mem. at 19.  More importantly, the

plaintiff also does not contest the State Department's assertion that disclosure of this information

"would undermine U.S. efforts in an important area of international relations." *See id.*  The

Court will treat the plaintiff's failure to contest these statements in any non-conclusory fashion as

a decision to concede them. *See, e.g.*, *Shankar v. ACS-GSI*, 258 F. App'x 344, 345 (D.C. Cir.

2007) (holding that plaintiff conceded the merits of an issue when he "did not respond in any

way to defendant's argument" on that issue in his opposition before the district court (citing

LCvR 7(b))); *Buggs v. Powell*, 293 F. Supp. 2d 135, 141 (D.D.C. 2003) ("It is understood in this

Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain

arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to

address as conceded.").   As a result of the plaintiff's concession, the defendant is entitled to

summary judgment as to the withholding of information, pursuant to FOIA Exemption 1, from

thirty-four documents:  L2, L3, N4A, N4B, N13, A32, S3C, S3E, S3F, S3G, S3K, NE2, NE4, NE9, NE10, E5, E6, E10, E13, E14, E15, E16, E17, E18, A3, N1, N2, E3*, E5*, E7, E11*, E12*, E15*, and E16*.[14]

Before moving on to address the plaintiff's arguments regarding information classified pursuant to § 1.4(b) of Executive Order 13,526, the Court will address the plaintiff's contention that, although documents E4* and E13* were properly classified under § 1.4(d) as containing information pertaining to foreign relations, "by describing the records as she did in her declaration, Ms. Grafeld has officially released part of the information currently being withheld, which begs a segregability analysis."  *See* Pl.'s Opp'n at 36.  By way of background, the State Department describes document E4* as a telegram that "discusses a trip by the U.S. Ambassador to consult with the Kurdistan Regional Government on the text of the cover letter to the hydrocarbon framework law and his subsequent discussion of the issue with the two Iraqi Presidents."  Grafeld Decl. ¶ 179.  Document E13* is a telegram that "describes a meeting between the U.S. Ambassador and a former Deputy Iraqi Prime Minister."  *Id.* ¶ 193.  In this meeting, the State Department also says that "[t]he Ambassador discussed several recent internal political developments, and asked for the Prime Minister's assistance on 'de-Ba'athification' and passage of a hydrocarbon law."  *Id.*  The plaintiff contends that, through its declaration, the State Department has officially disclosed five pieces of information regarding document E4*:

(1) "The U.S. Ambassador took a trip on or shortly before February 27, 2007, to meet with the Kurdistan Regional Government," (2) "They discussed the text of the cover letter to the hydrocarbon framework law," (3) the U.S. Ambassador "subsequently (but still on or before

---

[14] The parties have referred to each document by a Bates number, but as the plaintiff points out, twelve of the Bates numbers referenced in the State Department's declaration are used twice.  Therefore, in keeping with the plaintiff's denomination, and solely for the purpose of analytical clarity, the Court refers to the twelve duplicate Bates numbers contained in Request #3 with an asterisk, while their counterparts pertaining to Request #4 will remain unaltered. *See* Pl.'s Opp'n at 2.

February 27, 2007) discussed the issue with the two Iraqi Presidents," (4) "The U.S. Ambassador was involved in the drafting of this cover letter," and (5) "There was an agreed upon cover letter." Pl.'s Opp'n at 36.  Based on these purportedly disclosed pieces of information, the plaintiff argues that "State must segregate the information which only relays the information already publicly released . . . as well as the final agreed upon cover letter, which would not show the exact degree to which [the U.S. Ambassador] influenced the text." *Id.*  Similarly, the plaintiff argues that "information should be segregated and released from Document E13* which solely relays the fact of the discussion, the fact that the Ambassador asked for the Prime Minister's assistance on 'de-Ba'athification' and passage of a hydrocarbon law, and matters of similarly acknowledged scope." *Id.* at 37.

In response to this argument, the State Department contends that the pieces of information cited by the plaintiff are "'inextricably intertwined with exempt portions'" of the documents. *See* Def.'s Reply at 18 n.13 (quoting *Trans-Pac. Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1027 (D.C. Cir. 1999)).  The State Department also notes that the plaintiff's argument incorrectly "presumes that [the cited] information . . . exists in a format that may be distilled and produced to him." *Id.*  Along these same lines, the State Department concludes that "Plaintiff's arguments overlook Ms. Grafeld's testimony that 'there is no non-exempt information' in either of these documents 'that may be segregated and released.'" *Id.* (quoting Grafeld Decl. ¶¶ 139, 153).

The Court concludes that the State Department has satisfied its burden of demonstrating that it disclosed all "reasonably segregable portion[s]" of documents E4* and E13*.  *See* 5 U.S.C. § 552(b).  Under the most recent guidance set forth by the D.C. Circuit on this subject, an agency may satisfy its segregability obligations by (1) providing a *Vaughn* index that adequately

describes each withheld document and the exemption under which it was withheld; and (2) submitting a declaration attesting that the agency released all segregable material.  *See, e.g.*, *Loving v. Dep't of Def.*, 550 F.3d 32, 41 (D.C. Cir. 2008) (stating that "the description of the document set forth in the *Vaughn* index and the agency's declaration that it released all segregable material" is "sufficient for [the segregability] determination"); *Johnson v. Exec. Office for U.S. Att'ys*, 310 F.3d 771, 776 (D.C. Cir. 2002) (upholding agency's segregation efforts based on "comprehensive *Vaughn* index" and "the affidavits of [agency officials]").  With respect to documents E4* and E13*, the State Department has satisfied both of these requirements.  Indeed, as noted above, the plaintiff concedes that the State Department's *Vaughn* index adequately establishes that "the [withheld] material pertains to foreign relations."  Pl.'s Opp'n at 36.  Furthermore, the Court finds the agency's explanation of non-segregability logical and reasonable because the "pieces of information" denominated by the plaintiff appear unlikely to exist within the withheld document such that they could be discretely separated from the classified portions of the document.  For example, the plaintiff has presented no reason to believe that the "fact of the discussion" in document E13* is a piece of information that was specifically noted in the document, such that it could be segregated and released without releasing any classified information.  On the contrary, the Court concludes that such general facts regarding the overall context of the documents are unlikely to be reasonably segregable.  *See, e.g.*, *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 261 n.55 (D.C. Cir. 1977) ("[A] court may decline to order an agency to commit significant time and resources to the separation of disjointed words, phrases, or even sentences which taken separately or together have minimal or no information content.").  Therefore, the defendant is entitled to summary judgment as to its Exemption 1 withholdings in documents E4* and E13*.

*b)*        *Withholdings Pursuant to § 1.4(b) of E.O. 13,526*

In light of the plaintiff's failure to contest all of the State Department's withholdings

pursuant to § 1.4(d) of Executive Order 13,526, and the Court's conclusion that documents E4*

and E13* were properly withheld, the only remaining Exemption 1 withholding challenged by

the plaintiff is the information withheld from document A1 as "foreign government information"

under § 1.4(b) of Executive Order 13,526.  The information withheld from document A1,

however, was withheld under *both* § 1.4(b) and § 1.4(d) of Executive Order 13,526.  *See* Grafeld

Decl. ¶¶ 166–67.  The plaintiff concedes that he "is *not* challenging the invocation of § 1.4(d) in

Document A1," *see* Pl.'s Opp'n at 35–36, and therefore the Court need not decide whether the

State Department also properly classified the withheld information pursuant to § 1.4(b).

*c)*        *Compliance with § 1.7(d) of E.O. 13,526 in Classification of Five*
            *Responsive Records*

Although the foregoing discussion establishes that none of the plaintiff's substantive

challenges to the State Department's Exemption 1 withholdings is sufficient to defeat summary

judgment, the plaintiff also advances a second, procedural argument in favor of disclosing

certain documents withheld under Exemption 1.  The plaintiff contends that five of the thirty-

seven challenged documents withheld under Exemption 1 "were all originally unclassified or

'Sensitive' records and were later classified."  Pl.'s Opp'n at 23.  Since this raises the possibility

that these documents were classified *after* the plaintiff submitted his FOIA requests, it also raises

the issue of whether the State Department complied with § 1.7(d) of Executive Order 13,526,

which provides that information sought through a FOIA request may be classified after the

request is submitted, but "only if such classification . . . is accomplished on a document-by-

document basis with the personal participation or under the direction of the agency head, the

deputy agency head, or the senior agency official."  Exec. Order 13,526 § 1.7(d); *see also* Pl.'s

Opp'n at 24.  Accordingly, the plaintiff argues that, in order to satisfy this procedural requirement, the State Department must establish either that the five documents in question were classified prior to receipt of the plaintiff's FOIA requests or that they were classified in accordance with § 1.7(d).  *See* Pl.'s Opp'n at 24.

The State Department responds by citing to one of its own regulations, which authorizes the Deputy Assistant Secretary for Records and Publishing Services (now referred to as Global Information Services, *see* Def.'s Reply at 13 n.8) "to be the official to classify information on a document-by-document basis consistent with the circumstances and procedures described in" what is now § 1.7(d) of Executive Order 13,526.  *See* Bureau of Administration; Classification Authority Acting Under the Direction of the Senior Agency Official, 64 Fed. Reg. 7227 (Feb. 12, 1999).  In light of this authorization, the State Department argues that "Ms. Grafeld, as Deputy Assistant Secretary for Global Information Services, had the authority to classify as 'Confidential' Documents N13, NE2, NE4, NE10, and N1."  Def.'s Reply at 13.  The plaintiff nevertheless contends that "State cannot be allowed to reduce a specific provision designed to provide a higher level of accountability for classification decisions made *after* a FOIA request to mootness by simply publishing a single Notice in the *Federal Register* and then forgetting about it."  Pl.'s Surreply at 5.  Rather, the plaintiff argues that § 1.7(d) requires that one of the officials listed in that section "make such a determination or direct another to do so *each time* such classification is desired and *for each document*."  *Id.*  In other words, the plaintiff contends that a general grant of delegated authority to conduct the document-by-document review required by § 1.7(d) is invalid.  The Court entertained and rejected this exact same argument, however, in a case decided just last month.  *See Mobley v. CIA*, Nos. 11-2072, 11-2073, 2013 WL 452932, at *27–28 (D.D.C. Feb. 7, 2013).  In fact, plaintiff's counsel in the instant action represented the

plaintiff in *Mobley* as well and advanced this § 1.7(d) argument *verbatim* in his brief to the Court

in that case.  As it did in *Mobley*, the Court "disagrees with the plaintiff['s] cramped reading of

Executive Order 13,526" because "[n]othing in the text of the Order evinces any intent to require

the senior agency official to direct others to make document-by-document classification

determinations 'each time such classification is desired and for each document.'"  *Id.* at *28.

Although the Court rejects the plaintiff's policy argument regarding § 1.7(d), the Court

nevertheless concludes that the State Department must submit further information to establish

that it complied with § 1.7(d).  In particular, although Ms. Grafeld clearly "had the authority to

classify as 'Confidential' Documents N13, NE2, NE4, NE10, and N1," Def.'s Reply at 13, the

State Department has not established that Ms. Grafeld was in fact the individual who classified

these five documents.  Unlike in *Mobley*, the State Department has not established in the instant

action that Ms. Grafeld "'personally considered' the withheld portions of the . . . documents

contested by the plaintiffs and determined that their classification needed to be upgraded after

[the plaintiff] had already filed his FOIA[] request."  *See Mobley*, 2013 WL 452932, at *28.

Therefore, in order to establish its compliance with § 1.7(d), the State Department must put forth

evidence that an individual authorized to classify information under § 1.7(d) in fact classified the

information withheld from documents N13, NE2, NE4, NE10, and N1.[15]

## 2.  *Material Withheld Under FOIA Exemption 5*

The plaintiff's final substantive challenge to the State Department's responses to his

FOIA requests contends that the State Department improperly withheld certain information

under FOIA Exemption 5.  That provision of the FOIA exempts materials that are "inter-agency

or intra-agency memorandums or letters which would not be available by law to a party other

---

[15] Alternatively, the State Department may also put forth evidence that documents N13, NE2, NE4, NE10, and N1 were classified prior to April 13, 2009, when the plaintiff's first FOIA request was submitted to the State Department.

than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  To be properly withheld

under Exemption 5, "a document must . . . satisfy two conditions:  its source must be a

Government agency, and it must fall within the ambit of a privilege against discovery under

judicial standards that would govern litigation against the agency that holds it."  *Dep't of Interior*

*v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001).

In the instant action, the State Department withheld records, in whole or in part, under

both the deliberative process privilege and the attorney-client privilege.  *See* Def.'s Mem. at 23.

The plaintiff challenges the State Department's invocation of the deliberative process privilege in

ten documents (L2, L10, N3, N4, N5, N13, S3E, NE9, NE11A, NE11B) as well as the State

Department's invocation of the attorney-client privilege in one document (L10).  *See* Pl.'s Opp'n

at 37.  The Court will first discuss the plaintiff's objections regarding the deliberative process

privilege before addressing his objections regarding the attorney-client privilege.

a)      *Deliberative Process Privilege*

"The deliberative process privilege protects 'documents reflecting advisory opinions,

recommendations and deliberations comprising part of the process by which governmental

decisions and policies are formulated.'"  *Loving*, 550 F.3d at 38 (quoting *Klamath Water*, 532

U.S. at 8).  "To qualify for Exemption 5 protection under the deliberative process privilege, 'an

agency's materials must be both predecisional and a part of the deliberative process.'"  *Nat'l*

*Inst. of Military Justice v. U.S. Dep't of Def.*, 512 F.3d 677, 680 n.4 (D.C. Cir. 2008) (quoting

*Formaldehyde Inst. v. Dep't of Health & Human Servs.*, 889 F.2d 1118, 1121 (D.C. Cir. 1989)).

The Supreme Court has acknowledged that "[t]he deliberative process privilege rests on the

obvious realization that officials will not communicate candidly among themselves if each

remark is a potential item of discovery and front page news," and the privilege's "object is to

enhance 'the quality of agency decisions,' by protecting open and frank discussion among those

who make them within the Government." *Klamath Water*, 532 U.S. at 8–9 (citations omitted); *see also Tax Analysts v. IRS*, 117 F.3d 607, 617 (D.C. Cir. 1997) ("[T]he deliberative process privilege . . . reflect[s] the legislative judgment that 'the quality of administrative decision-making would be seriously undermined if agencies were forced to operate in a fishbowl because the full and frank exchange of ideas on legal or policy matters would be impossible.'" (quoting *Mead Data*, 566 F.2d at 256) (internal quotation marks omitted)).

"The need to describe each withheld document when Exemption 5 is at issue is particularly acute because 'the deliberative process privilege is so dependent upon the individual document and the role it plays in the administrative process.'" *Animal Legal Def. Fund, Inc. v. Dep't of Air Force*, 44 F. Supp. 2d 295, 299 (D.D.C. 1999) (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 867 (D.C. Cir. 1980)). "The agency must establish 'what deliberative process is involved, and the role played by the documents in issue in the course of that process.'" *Senate of P.R. v. U.S. Dep't of Justice*, 823 F.2d 574, 585–86 (D.C. Cir. 1987) (quoting *Coastal States*, 617 F.2d at 868). "In addition to explaining the 'function and significance of the document[s] in the agency's decisionmaking process,'" the agency "must describe 'the nature of the decisionmaking authority vested in the office or person issuing the disputed document[s], and the positions in the chain of command of the parties to the documents.'" *Elec. Frontier Found. v. U.S. Dep't of Justice* ("*EFF*"), 826 F. Supp. 2d 157, 168 (D.D.C. 2011) (quoting *Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 258 (D.C. Cir. 1982)).

As to the ten challenged documents withheld under the deliberative process privilege, the plaintiff argues that the State Department's description of the documents in the *Vaughn* index fail to provide the information necessary to determine whether the privilege applies. *See* Pl.'s Opp'n at 39–41. In particular, the plaintiff contends that the State Department's explanations fail, *inter*

*alia*, to provide one or more of the following:  (1) the deliberative process in question, (2) whether the documents contain opinions on legal or policy matters, or (3) whether the information was shared with third parties or adopted as agency policy.  *See id.*  The State Department, however, argues that its withholdings under the deliberative process privilege were proper because the withheld information falls into one of three categories:  (1) "pre-decisional revisions to draft policy documents," (2) "recommendations and judgments regarding then-current foreign policy issues," or (3) "debates as to how to structure the Technical Service Contracts ('TSCs') governing the development of Iraq's oil fields."  *See* Def.'s Mem. at 24–25. The State Department also contends that its sworn declaration contains "paragraphs of factual context that explain the nature of the deliberations at issue and legal and policy matter to which they pertained."  *See* Def.'s Reply at 18.

The Court agrees with the plaintiff, however, that the State Department has failed to provide sufficient information regarding these ten documents for the Court to conclude that they were properly withheld under the deliberative process privilege.  The State Department's defense of its withholdings in its briefing consists mostly of conclusory quotations from case law that describes the kind of material normally exempt from disclosure under the privilege.  *See, e.g.*, Def.'s Reply at 18–22.  These perfunctory citations, however, do not fill the gaps in the factual context necessary to invoke the deliberative process privilege.  In particular, three pieces of factual context normally crucial to determining whether the privilege applies—the nature of the deliberative process involved, the role the document played in that process, and the nature of the decisionmaking authority vested in the document's author—are noticeably absent from the State Department's descriptions of these ten documents in its *Vaughn* index.  To illustrate these deficiencies, the Court will discuss a number of examples from the ten documents at issue.

34

One particularly illustrative example of the deficiencies in the State Department's declaration is the agency's description of document N5, which lacks all three of the aforementioned pieces of factual context. All that the State Department's declaration states about this document is that it is an e-mail exchange "between two U.S. government agencies" that "contains deliberative and pre-decisional comments between two U.S. government agencies on a specific and contentious aspect of the technical service agreements negotiations." Grafeld Decl. ¶¶ 89–90. In attempting to defend this description as adequate, the State Department argues that the description establishes "the fact that agency personnel were sharing recommendations and judgments about the technical services contracts." *See* Def.'s Reply at 20. First, merely stating that the commentary in the e-mail exchange was about "a specific and contentious aspect of the technical service agreements negotiations," *see* Grafeld Decl. ¶ 90, does not adequately convey "a *specific* deliberative process to which the withheld [e-mail exchange] contributed," *see EFF*, 826 F. Supp. 2d at 168 (emphasis added). It is unclear from the State Department's declaration, for example, whether the two unnamed personnel were merely *reacting* to a contentious aspect of the negotiations or whether they were, as the State Department claims in its brief, "sharing recommendations and judgments about the technical services contracts." *See* Def.'s Reply at 20. It is also completely unclear what role, if any, this commentary may have played in the unspecified deliberative process, since the positions of the personnel involved in the e-mail exchange and the relevance of those positions to the negotiations is not addressed. All that the Court can glean from the State Department's description is that two unidentified personnel in two unidentified government agencies exchanged some sort of "comments" about some unspecified "aspect" of a negotiation over TSCs. This description does not even specify when this exchange took place vis-à-vis a final

policy decision on this unspecified "aspect" of the negotiations, which is fundamental in determining whether the exchange was pre-decisional. It is insufficient for the State Department to substitute a string of buzz-word adjectives like "deliberative," "pre-decisional," and "contentious," in the place of a meaningful description of the factual context surrounding a document.

Indeed, many of the aforementioned deficiencies in the description of document N5 carry over into the other nine challenged documents as well. For example, the State Department describes document L10 as an "e-mail chain within the Department of State" that "contain[s] discussion of various aspects, including legal aspects, of U.S.-Iraq negotiations of [TSCs]." *See* Grafeld Decl. ¶¶ 82–83. This vague description begs numerous important questions, such as: Which "various aspects" were discussed and why would such aspects be pre-decisional? What decisionmaking authority was vested in the individuals "within the Department of State" who participated in this discussion? What role did this discussion play in arriving at some final decision about the unnamed "various aspects" of the negotiations? Indeed, the State Department describes the relevant decision at issue in three of these documents as some unspecified "aspect" or "detail[]" of the TSC negotiations, without any elaboration about what *sort* of aspect or detail is being discussed and how or why that aspect or detail was the subject of an internal decisionmaking process. *See, e.g.*, Grafeld Decl. ¶ 75 (describing document L2, an e-mail exchange that contains "informal exchange of information . . . on details of negotiations regarding [TSCs] between the U.S. and Iraqi governments"); *id.* ¶ 83 (document discussing "various aspects" of the TSC negotiations); *id.* ¶ 90 (document containing discussion of "a specific and contentious aspect" of the TSC negotiations). Furthermore, the State Department does not specify what role *any* of the ten challenged documents played in the often-unspecified

36

deliberative process at issue.  Without that basic information, the Court cannot conclude that any

of the challenged documents were predecisional or deliberative.  *See, e.g.*, *Senate of P.R.*, 823

F.2d at 585–86; *Arthur Andersen*, 679 F.2d at 258.

Another notable deficiency in the State Department's declaration is that three of the

documents withheld do not even appear to relate to deliberative processes within the U.S

government.   For example, document NE9 is an "e-mail exchange . . . between Embassy

Baghdad and [State] Department officials" that contains "a report of information received from a

senior Iraqi official on *the deliberations of the Iraqi government*."  *See* Grafeld Decl. ¶¶ 126–27

(emphasis added).  The only lip service paid to a deliberative process of the United States is the

passing statement in the State Department's declaration that "[a] commentary on the report from

various department officials has also been withheld."  *Id.* ¶ 127.  Likewise, documents NE11A

and NE11B are "information paper[s]" that "summarize[] changes made to the text of the

proposed hydrocarbon law."  *See id.* ¶¶ 130–33.  Although unclear from the State Department's

declaration, it is reasonable to assume that, since the hydrocarbon law is a piece of *Iraqi*

legislation, the document identifies changes made by the Iraqi government, not changes made by

the U.S. State Department.  Even if these were edits made by the State Department, however, the

defendant's declaration does not indicate what ultimate decision these edits were relevant to

making.  The only logical decision resulting from such edits would be the final text of the Iraqi

legislation, but of course that final text would presumably be a decision made by the Iraqi

government, not by State Department officials.  All that the State Department says in its brief on

this issue is that edits would "likely inform subsequent steps in State's decisionmaking process."

Def.'s Reply at 22.  Once again, however, the Court and the plaintiff remain completely in the

dark about *what* decisionmaking process the State Department is referring to, let alone why proposed revisions to Iraqi legislation would influence that process.

A final overarching deficiency in the State Department's declaration is that it does not specify the identity or decisionmaking authority of any of the authors of any of the challenged documents.  The D.C. Circuit has acknowledged that "[t]he identity of the parties to the memorandum is important" because "a document from a subordinate to a superior official is more likely to be predecisional, while a document moving in the opposite direction is more likely to contain instructions to staff explaining the reasons for a decision already made." *Coastal States*, 617 F.2d at 868.  Yet, the most detail that the defendant's declaration gives in this regard is that the author of a document or a participant in an e-mail chain was an "official" or "officer[]" of a particular agency.  *See* Grafeld Decl. ¶¶ 74, 84, 126.  Often times, even less detail is provided, such as merely saying that a document was from "within the Department of State," *see, e.g.*, *id.* ¶ 82, was "between two U.S. government agencies," *see id.* ¶ 89, or was "between the Department of State and Embassy Baghdad," *see id.* ¶ 97.  These opaque descriptions do not shed any light on whether the contents of these documents "reflect the give and take of the deliberative process" or whether they are merely explanations or summaries of existing policy. *See Public Citizen*, 598 F.3d at 876.

Based on the deficiencies in the State Department's declaration discussed above, the Court concludes "'not that the documents are not exempt as a matter of law, but that the agency has failed to supply' in its *Vaughn* submissions 'the minimal information necessary to make a determination' concerning applicability of the deliberative process privilege." *EFF*, 826 F. Supp. 2d at 173 (quoting *Coastal States*, 617 F.2d at 861).  Therefore, the Court will deny summary judgment to the State Department regarding its Exemption 5 withholding

determinations that invoke the deliberative process privilege in the ten challenged documents. The defendant may either supplement its declaration demonstrating the applicability of the deliberative process privilege to the information contained in these ten documents or disclose that information to the plaintiff.

> b) *Attorney-Client Privilege*

The plaintiff also challenges the State Department's invocation of the attorney-client privilege to withhold certain information from document L10. "The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). "Its purpose is to encourage full and frank communications between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Id.* To be privileged, a communication must be "for the purpose of securing *primarily* either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding." *In re Grand Jury*, 475 F.3d 1299, 1304 (D.C. Cir. 2007) (emphasis added) (internal quotation marks omitted). The Supreme Court has also clearly recognized that "the privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Upjohn*, 449 U.S. at 390.

As briefly discussed above, the State Department's declaration describes document L10 as "an e-mail chain within the Department of State" that contains "discussion of various aspects, including legal aspects, of U.S.-Iraq negotiations of [TSCs]." Grafeld Decl. ¶¶ 82–83. Additionally, the declaration avers that "[t]wo of the three e-mails in the exchange . . . contain attorney client privileged information." *Id.* ¶ 83. This sparse information is insufficient to permit the Court to conclude that the two e-mails withheld under the attorney-client privilege were sent "for the purpose of securing primarily either (i) an opinion on law or (ii) legal services

or (iii) assistance in some legal proceeding." *In re Grand Jury*, 475 F.3d at 1304 (internal quotation marks omitted).  The State Department must provide more than the talismanic adjective "legal" and the conclusory phrase "attorney client privileged" to establish that a document was sent for the purpose of conveying legal advice.  *See* Grafeld Decl. ¶ 83.  At the very least, the State Department must describe with some reasonable level of detail the nature of the legal issue or issues for which advice was being sought and whether the withheld e-mails seek legal advice, convey legal advice, or both.[16]  The State Department must also provide some evidence from which the Court could conclude that the purportedly privileged communications were confidential.

As a result of the gaps in the State Department's declaration, the Court does not have enough information to determine, one way or the other, whether the attorney-client privilege applies to document L10.  Therefore, the Court will deny summary judgment to the State Department regarding its withholding of information from document L10 under the auspices of the attorney-client privilege.  The defendant may either supplement its declaration demonstrating the applicability of the attorney-client privilege to this document or disclose the document to the plaintiff.

**D.      <u>Segregability</u>**

The FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b).  Even when a plaintiff does not challenge the segregability efforts of an agency, the Court has "an affirmative duty to consider the segregability issue *sua sponte*."

---

[16] Although the State Department's brief states that document L10 "contained legal advice from State's attorneys," *see* Def.'s Reply at 23, the State Department's sworn declaration does not mention whether any of the participants in the e-mail chain in document L10 were attorneys acting in their capacity as legal advisors, *see* Grafeld Decl. ¶¶ 82–83.

*Trans-Pacific*, 177 F.3d at 1028.  The D.C. Circuit has acknowledged that establishing the non-segregability of non-exempt material "presents problems for the agency since . . . segregability depends entirely on what information is in a document and how it is presented." *Mead Data*, 566 F.2d at 261.  Therefore, although "agencies should not be forced to provide such a detailed justification that would itself compromise the secret nature of potentially exempt information," agencies "must be required to provide the reasons behind their conclusions in order that they may be challenged by FOIA plaintiffs and reviewed by the courts." *Id.*  To this end, the Circuit has said that "[i]n addition to a statement of its reasons, an agency should also describe what proportion of the information in a document is non-exempt and how that material is dispersed throughout the document." *Id.*  Under *Mead Data*, if a small proportion of the information is non-exempt, the agency's explanatory burden is less, and if a larger proportion of the information is non-exempt, "the courts should require a high standard of proof for an agency claim that the burden of separation justifies nondisclosure or that disclosure of the non-exempt material would indirectly reveal the exempt information." *Id.*

On the other hand, however, the Circuit has more recently held that "[a]gencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material," which must be overcome by some "quantum of evidence" by the requester. *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007).  Indeed, certain, more recent decisions from the D.C. Circuit have indicated that the standard first articulated in *Mead Data* has been relaxed.  As discussed above, those decisions have held that an agency may satisfy its segregability obligations by (1) providing a *Vaughn* index that adequately describes each withheld document and the exemption under which it was withheld; and (2) submitting a declaration attesting that the agency released all segregable material. *See, e.g., Loving*, 550 F.3d

41

at 41 (stating that "the description of the document set forth in the *Vaughn* index and the agency's declaration that it released all segregable material" are "sufficient for [the segregability] determination"); *Johnson*, 310 F.3d at 776 (upholding agency's segregation efforts based on "comprehensive *Vaughn* index" and "the affidavits of [agency officials]").

In light of the deficiencies in the defendant's *Vaughn* index discussed above, the Court concludes that the defendant's segregability efforts—at least with respect to the documents for which the Court has denied summary judgment to the defendant—do not meet even the more lenient standard articulated in *Loving* and *Johnson*. Those cases require, at a minimum, that an agency submit a "comprehensive *Vaughn* index," *Johnson*, 310 F.3d at 776, which sufficiently describes each document withheld and the reasons for the withholding, *see Loving*, 550 F.3d at 41. Although the Court does not doubt the agency's statement that "[t]he Department reviewed each and every document on a line-by-line basis, and only withheld exempt information," Grafeld Decl. ¶ 206, absent a sufficient *Vaughn* index as to the fourteen documents for which the Court denies summary judgment, the State Department must provide other facts, beyond its good-faith assurances, that would establish that it released all reasonably segregable, non-exempt information from these fourteen documents. Such information could include, for example, a description of "what proportion of the information in a document is non-exempt and how that material is dispersed throughout the document." *Mead Data*, 566 F.2d at 261.

## IV.    CONCLUSION

As the foregoing discussion makes clear, the Court grants summary judgment to the defendant regarding its fee waiver and expedited processing determinations because the plaintiff's challenges to those determinations are now moot. Relatedly, the Court also denies the plaintiff's motion for leave to file additional exhibits to support a purported policy-or-practice

claim regarding the agency's fee waiver and expedited processing determinations.  The Court

further grants summary judgment to the defendant with respect to (1) the adequacy of its search

efforts in response to the plaintiff's FOIA requests; and (2) its withholding determinations under

FOIA Exemption 1 that are contested by the plaintiff, with the exception that the State

Department must provide further evidence that it properly complied with § 1.7(d) of Executive

Order 13,526 in classifying information in documents N13, NE2, NE4, NE10, and N1.  The

Court denies summary judgment to the State Department with respect to its withholding

determinations under FOIA Exemption 5 that are contested by the plaintiff.  These

determinations include the information withheld from documents L2, L10, N3, N4, N5, N13,

S3E, NE9, NE11A, and NE11B under both the deliberative process privilege and the attorney-

client privilege.  The Court also denies summary judgment to the State Department regarding its

efforts to release any reasonably segregable, non-exempt information from documents L2, L10,

N3, N4, N5, N13, S3E, NE9, NE11A, NE11B, NE2, NE4, NE10, and N1.  Accordingly, if the

defendant elects to continue to withhold the fourteen documents listed above, in whole or in part,

it shall file jointly with the plaintiff, within twenty days, a proposed scheduling order to govern

the timing of further proceedings in this action, including the filing of any further dispositive

motions.

   An appropriate Order accompanies this Memorandum Opinion.

   Date: March 4, 2013

           /s/ *Beryl A. Howell*
           BERYL A. HOWELL
           United States District Judge